Filed 7/20/16  P. v. Ochoa CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B262795 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA405886) |
| v. | |
| JUAN OCHOA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Mader, Judge.  Affirmed.

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

The Los Angeles County District Attorney charged defendant and appellant Juan Ochoa (defendant) with three counts of robbery, one count of attempted robbery, assault with a firearm, and burglary. In connection with each of the counts, the District Attorney alleged the offenses were "committed for the benefit of, at the direction of, or in association with a[ ] criminal street gang, [and] with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code,[1] § 186.22, subd. (b).) A jury convicted defendant on all charges and returned true findings on the criminal street gang sentencing enhancements. We consider whether sufficient evidence supports the jury's gang enhancement findings.

## I. BACKGROUND

### A.  *The Offense Conduct*

In the evening on December 13, 2012, defendant and Jamie Galvan (Jamie)[2] walked into the Cancun Ole restaurant in East Los Angeles where a bartender was preparing for a fundraising event to take place later that night. Defendant was wearing a sweatshirt, a scarf, and a baseball cap with an "S" on it.

The restaurant was closed that day, and the bartender was alone. He offered the men a beer, thinking they were there for the fundraising event, at which point defendant or Jamie said "we're here for something else, motherfucker." Jamie then hit the bartender and defendant pulled out a handgun. Defendant pointed his gun at the bartender and Jaime instructed the bartender to open the restaurant's cash register. Defendant also told the bartender to "clear [him]self," whereupon the bartender removed his Rolex watch and gold chain while defendant and Jamie removed cash from the register. Defendant and Jamie left the restaurant with approximately $400 to $500, as

---

[1]     Statutory references that follow are to the Penal Code.

[2]     As we will explain, the evidence at trial established Jamie Galvan's father, Jose Galvan, was also involved in the charged criminal conduct. We therefore use first names for clarity.

2

well as the bartender's watch, chain, and cell phone. They got into a light-colored SUV driven by a third person.

Approximately four hours later, an identical-looking SUV arrived at a bar called the Lampliter, which was about a mile and a half from the Cancun Ole. The vehicle pulled into an alley behind the bar's parking lot, and defendant and Jose Galvan (Jose), Jamie's father, got out. Defendant appeared to be wearing the same sweatshirt and scarf he had on earlier, and he was wearing a baseball cap. Jose was wearing an Oakland Raiders shirt and a cap with an "S" on it. Hendley Hutchinson, the Lampliter's security guard, approached and told defendant and Jose they could not park in the alley. They said they would move the car if they decided go into the bar and stay.

Hutchinson walked with defendant and Jose towards the bar, telling them there was karaoke going on inside and no cover charge but he would need to frisk them for weapons before entering. While Hutchinson was frisking Jose, defendant grabbed him and thrust a gun into his ribs. Defendant told Hutchinson to give up his gun, but Hutchinson did not carry one. Defendant asked what was in Hutchinson's pockets and told him to give defendant "everything." In the meantime, Hutchinson was backing up towards the front door of the Lampliter.

Hutchinson backed into the bar, with defendant and Jose following. The bar was loud, and most people apparently noticed nothing amiss. Defendant, who was using one hand to try to pull his scarf over the lower part of his face and holding the gun in the other, went to a patron standing next to the bar and directed him to get the attention of the bartender. Defendant told the bartender he wanted $100, aimed his gun in her direction, and told her to "move." She retrieved five $20 bills from the cash register and handed them to the patron. Defendant had Jose take the money, and both men then left in the SUV, which was driven by a third person.

Interior and exterior video surveillance cameras captured both robberies. The cameras showed a light-colored SUV pulling in close to each robbery location before defendant and either Jamie or Jose approached the entrance on foot. While defendant and either Jamie or Jose were inside each location, the person driving the SUV positioned it

3

directly outside the front door and then began to slowly pull away as soon as defendant and his respective confederate left the establishment. During the course of the robberies, none of the men announced a gang affiliation or made any gang signs. None of the victims were associated with rival gangs.

Later that night, a law enforcement officer stopped a silver Dodge Durango after hearing a broadcast over police radio that a vehicle matching the Durango's description was involved in an armed robbery. Three men were in the vehicle, and defendant, who was wearing a grey Converse sweatshirt, was identified as the front passenger. The driver at the time, Jose, was wearing a Raiders shirt. After two additional officers arrived to assist, they searched the vehicle and found a .25 millimeter handgun loaded with seven rounds as well as a replica handgun. Upon a later search of the vehicle after it was impounded, police found the Cancun Ole bartender's cell phone and a CD with Stoners 13 "gang writing" on the outside of it.

While in custody, defendant transferred the property on his person at the time of arrest, which included the Cancun Ole bartender's watch and gold chain, to his girlfriend, Candace Chavez (Chavez). Several days later, police retrieved from Chavez's home the watch and chain, which were in the same bag in which she had received them at the police station.

### B.    *The Charges*

With respect to the Cancun Ole incident, the District Attorney charged defendant with robbing the Cancun Ole bartender (count 5) and burglarizing the restaurant (count 6). As to the Lampliter incident, the District Attorney charged defendant with attempting to rob Lampliter security guard Hutchinson (count 1), assaulting him with a firearm (count 4), robbing the bartender (count 2), and robbing the unidentified bar patron (count 3). Most significant for our purposes, defendant was alleged to have committed all six

4

offenses for the benefit of, at the direction of, and in association with a criminal street gang pursuant to section 186.22, subdivision (b)(1).[3]

C. *Expert Testimony at Trial Concerning the Gang Enhancements*

At trial, both sides presented testimony by gang experts. Los Angeles County Sheriff's Deputy Eduardo Aguirre, who was the investigating officer for the Cancun Ole and Lampliter robberies, testified as the gang expert for the People. Aguirre had worked in the East Lost Angeles gang unit for approximately 10 years and had testified as a gang expert in "hundreds" of previous prosecutions. Defendant's gang expert, Martin Flores, was the sole defense witness. For approximately 20 years, Flores had worked with gang members, victims, families, and other community stakeholders in the course of developing programs, conferences, and presentations about gangs. He had testified as an expert approximately 100 times over the previous seven or eight years, and he was familiar with the Stoners 13 street gang and its history.

Aguirre had interviewed defendant about the Cancun Ole robbery, and a portion of the transcript was entered into evidence. In the interview, defendant admitted to the robbery. He said he had just gotten out of prison, had twin children with Chavez, and had no job. He claimed he did not intend to hurt anyone during the robberies but simply wanted his "babies [to] enjoy their Christmas a little better . . . ."

Both Aguirre and the defense's expert Flores agreed on certain matters. They both opined defendant was an active member of the Stoners 13 gang.[4] Defendant had admitted as much to Aguirre, and he had Stoners-related tattoos. Both experts also testified the Cancun Ole and Lampliter were located outside Stoners 13 territory. In that respect, their testimony diverged from a statement defendant apparently made to Aguirre, in which he

---

[3] The amended information also alleged certain firearm sentencing enhancements under section 12022.53 and sections 1203.06 and 12022.5.

[4] The parties stipulated that Stoners 13 was a criminal street gang for purposes of section 186.22.

indicated that Stoners 13 territory encompassed one of the robbery locations. Both experts, however, described gang boundaries as fluid and subject to varying descriptions, even by the gang members themselves. According to Aguirre, commonly used Stoners logos and tattoos included the letter "S"—especially the Superman emblem—and the terms "Stoners" and "13." Flores similarly testified that Stoners gang members used the word "Stoners," the number "13" written in different ways, and an "S" as in the symbol for Superman.

The areas of agreement between the two experts generally ended there. Aguirre opined Jose was an active member of Stoners 13. Aguirre based his opinion on the fact that he "learned [after the arrests] that [Jose] was a member of the Stoners 13 gang"[5] and Jose wore a cap with an "S" on it during the Lampliter robbery. In contrast to Aguirre, Flores believed Jose had been a Stoners 13 member in the past but was no longer active. He based his opinion on the fact that Jose had a Stoners-related tattoo but there were no indications he was currently active, including no interactions with law enforcement for a long time. Flores did concede that if someone wearing a cap with an "S" on it committed a robbery alongside an active Stoners gang member, the cap might represent Stoners 13. But Flores stated an "S" could also be consistent with a team logo or some other emblem. Aguirre opined that Jamie was an "associate" of the Stoners 13 gang, hanging out with them in order to gain acceptance. Flores saw no evidence Jamie was a gang member.

In Aguirre's opinion, defendant committed both robberies for the benefit of the Stoners 13 gang. That the robberies occurred outside of Stoners territory did not necessarily prove otherwise, reasoned Aguirre, because gang members undertook to expand their territory by committing crimes outside of it. Aguirre testified that robberies benefited gangs generally by providing notoriety, intimidating people in that area from reporting crimes, and providing valuables that could be split among members or sold to

---

[5] Aguirre was not asked during his testimony how he "learned" Jose was a gang member. Aguirre did testify at one point that Jose admitted to being in the Stoners 13 gang, but he similarly was not asked to describe the circumstances under which Jose made the admission.

fund the gang. During cross examination, Aguirre acknowledged no gang slogans had been called out during the robberies and that gang members, even multiple gang members acting together, could commit crimes for their own personal benefit without any connection to the gang.

Aguirre also believed the robberies were performed in association with a criminal street gang because "two or more" gang members acted together, going to the robbery locations armed with a gun. He testified that gang members only committed crimes with fellow gang members or others they trusted not to inform the police.

Flores opined that both robberies were committed for personal benefit and not for the benefit of, or in association with, the Stoners 13 gang, because none of the perpetrators did anything to identify themselves as members of the Stoners: they did not refer to the gang, make gang signs, wear gang attire (he, unlike Aguirre, discounted the "S" logo ball caps), or leave any gang graffiti behind. While Flores conceded that crimes committed outside of a gang's territory were sometimes perpetrated for the benefit of the gang, he did not believe that to be the case here because neither location was known as a hangout of a rival gang.

Flores further found it significant that the watch and chain stolen from the Cancun Ole bartender were held by Chavez (not another gang member), and that defendant asked only for $100 at the Lampliter. These details suggested to Flores that defendant was "desperate" for "some quick money," which was consistent with his statement that he wanted money to spend on his kids at Christmas. To Flores, the type of crime and where it occurred were less significant for the purpose of the gang allegation than who committed the crime and whether the spoils were "going back to the neighborhood." Flores did agree, however, that in some cases proceeds from a crime were given to a wife or girlfriend to conceal them from law enforcement.

*D.    The Verdict*

The jury convicted defendant on all six counts and found the gang and firearms allegations true.[6] The trial court sentenced defendant to state prison for 66 years and four months, with 20 years of that total sentence attributable to the jury's true findings on the section 186.22 gang enhancement allegations.

## II.  DISCUSSION

Defendant argues the People presented insufficient evidence to support the jury's true findings on the gang sentencing enhancements.  He contends there was insufficient evidence he acted for the benefit of, or in association with, a criminal street gang. Defendant further argues that because (in his view) he was the only gang member involved in the offenses, he necessarily lacked specific intent to assist criminal conduct by other gang members.  Because we conclude there was sufficient evidence on which a jury could rely to find defendant and Jose, a fellow member of Stoners 13, came together as gang members to commit both robberies, we affirm the judgment.

*A.    Standard of Review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also

---

[6]    The true findings on the gang enhancements were pursuant to section 186.22, subdivision (b)(1)(B) in connection with counts one and two and pursuant to section 186.22, subdivision (b)(1)(C) in connection with counts three through six.

reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

We follow the same standard when the conviction rests primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) Although the jury is obligated to acquit a defendant if it finds the circumstantial evidence allows for two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court, that must be convinced of the defendant's guilt beyond a reasonable doubt. (*Ibid*.) "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)" (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.)

An expert may testify to the culture and habits of street gangs in support of a gang sentencing enhancement. (*People v. Vang* (2011) 52 Cal.4th 1038, 1044; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1197 (*Frank S.*).)

### B.    *Sufficient Evidence Supports the Gang Allegations*

Section 186.22, subdivision (b)(1) requires the trial court to impose an additional, consecutive prison term upon a defendant "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." Thus, the prosecution must prove two things under subdivision (b)(1): first, that the offense was gang related, and second, that the offense was committed with a specific intent to promote, further, or assist criminal conduct by gang members. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1139; *Albillar*, *supra*, 51 Cal.4th at p. 59.) A defendant's membership in a gang, standing alone, is insufficient to justify a section 186.22, subdivision (b)(1) enhancement. (See, e.g., *Frank S.*, *supra*, 141 Cal.App.4th at p. 1199.)

9

*1.     Defendant committed the Lampliter robbery in association with a criminal street gang*

Under the applicable standard of review, the record supports the finding that defendant committed the Lampliter robbery in association with the Stoners 13 gang because there was sufficient evidence that both defendant and Jose were members of Stoners 13 and that they came together as gang members to commit the robbery.

Defendant's own status as a Stoners 13 member was undisputed at trial. As to Jose, there was evidence that he had a Stoners-related tattoo and was wearing a ball cap with an "S" on it, a known Stoners emblem, during the Lampliter robbery. There was also evidence indicating the vehicle involved in the robberies, driven by Jose when he and defendant were arrested, contained a CD with Stoners gang writing on it. Aguirre opined that Jose was an active Stoners 13 member, and notwithstanding Flores's testimony that Jose had had no interactions with law enforcement for a long period of time (which caused him to believe Jose was only a member of Stoners 13 in the past), the jury could reasonably rely on Aguirre's testimony and supporting evidence to find Jose was an active member of Stoners 13 at the time of the crimes.

Aguirre testified that active gang members only commit crimes with fellow gang members or others they trust. There is no indication in the record that defendant and Jose were related to each other or had other reasons, apart from their common gang membership, to be together on the night of the crimes. Surveillance video footage of the vehicle approaching, waiting at, and leaving the scene of the Lampliter robbery suggested the crime was pre-planned. Relying on the expert testimony and the associated evidence, the jury could reasonably conclude defendant and Jose "came together *as gang members*" and relied on their common gang membership to commit the robbery offenses at the Lampliter. (*Albillar*, *supra*, 51 Cal.4th at p. 62.)

Section 186.22, subdivision (b)(1)'s second prong, the requirement that a defendant specifically intend to "promote, further, or assist in any criminal conduct by gang members," is met where the defendant acts with an intent to assist a known fellow gang member or members in committing the charged offense. (*Albillar*, *supra*, 51

10

Cal.4th at p. 66.)  Thus, the evidence that defendant committed the Lampliter robbery with Jose—who, again, the jury was entitled to find was a gang member—was sufficient to establish defendant acted with the specific intent to promote, further, or assist criminal conduct by gang members.  (*Id.* at p. 68 ["[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"].)

### 2. *Defendant committed the Cancun Ole robbery in association with a criminal street gang*

Evidence of Jose's gang status and criminal involvement on the night in question also provides sufficient support—under the applicable standard of review—for the finding that defendant committed the Cancun Ole robbery in association with the Stoners 13 gang.

Defendant, wearing his "S" emblazoned ball cap, entered the restaurant with Jamie, who Aguirre described as a Stoners 13 "associate."  It is indisputable there was also a third person involved who drove the getaway SUV.  As with the Lampliter robbery, surveillance video of the vehicle's whereabouts before, during, and after the Cancun Ole robbery shows the robbery was planned in advance and the driver knew defendant's criminal purpose in entering the restaurant.

Based on evidence the same SUV was used in both robberies, that the crimes at the Cancun Ole and Lampliter were quite close in distance and time (about a mile-and-a-half apart and within four hours of each other), and that Jose was driving the vehicle when it was pulled over by police later that same night, the jury had a sound basis to infer all three men were involved in the robberies at both locations, with the Galvan father and son duo playing different roles in each (Jose being the getaway driver for the Cancun Ole robbery rather than the man accompanying defendant inside).  This is an inference we too must draw on review for sufficiency of the evidence (*Albillar*, *supra*, 51 Cal.4th at p. 60), and it is an inference that provides adequate support for the jury's finding defendant

11

committed the Cancun Ole robbery in association with the Stoners 13 gang; the three men, defendant and Jose in particular, came together around their common gang ties to commit the crimes.  And as we have held in connection with the robbery offenses at the Lampliter, these same facts also constitute sufficient evidence defendant committed the Cancun Ole robbery with the specific intent to promote, further, or assist criminal conduct by fellow gang members, namely, Jose.[7]

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

KRIEGLER, Acting P.J.

RAPHAEL, J.[*]

---

[7] Because sufficient evidence supports the gang sentencing enhancements based on the "in association with" prong of section 186.22, we need not address the evidence, or the lack thereof, that the crimes were committed for the benefit of the Stoners 13 gang. Similarly, because defendant was not subjected to gang enhancements on the basis of his status as a gang member alone, we reject his First Amendment contention without need for further discussion.  (See *People v. Loeun* (1997) 17 Cal.4th 1, 11.)

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.